BNDLSS

# U.S. District Court
## Southern District of Florida (Ft Lauderdale)
## CRIMINAL DOCKET FOR CASE #: <u>0:19–mj–06039–LSS</u> All Defendants
### *Internal Use Only*

Case title: USA v. Stone

Date Filed: 01/25/2019
Date Terminated: 01/25/2019

Assigned to: Magistrate Judge Lurana S. Snow

**<u>Defendant (1)</u>**

| | | |
|---|---|---|
| **Roger Jason Stone, Jr** | represented by | **Robert Craig Buschel** |
| 19579–104 | | Buschel Gibbons, P.A. |
| *YOB 1952 English* | | 100 S.E. 3rd Avenue |
| *TERMINATED: 01/25/2019* | | Suite 1300 |
| | | Fort Lauderdale, FL 33394 |
| | | 954–530–5301 |
| | | Fax: 954–320–6932 |
| | | Email: <u>Buschel@BGlaw–pa.com</u> |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Temporary* |

| **<u>Pending Counts</u>** | **<u>Disposition</u>** |
|---|---|
| None | |

| **<u>Highest Offense Level (Opening)</u>** | |
|---|---|
| None | |

| **<u>Terminated Counts</u>** | **<u>Disposition</u>** |
|---|---|
| None | |

| **<u>Highest Offense Level (Terminated)</u>** | |
|---|---|
| None | |

| **<u>Complaints</u>** | **<u>Disposition</u>** |
|---|---|
| 18:U.S.C.§1505 OBSTRUCTION OF PROCEEDING 18:U.S.C.1001(a)(2)FALSE STATEMENTS 18:U.S.C.§1512(b)(1)WITNESS TAMPERING | |

1

**Plaintiff**

**USA**                              represented by   **Jared M. Strauss**
United Sttes Attorney's Office
500 E. Broward Blvd.
Suite 700
Ft. Lauderdale, FL 33394
954 356–7255
Email: jared.strauss@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 01/25/2019 | 1 | 3 | Magistrate Removal of Indictment from DISTRICT OF COLUMBIA Case number in the other District 1:19–CR–00018 as to Roger Jason Stone, Jr (1). (at) (Entered: 01/25/2019) |
| 01/25/2019 | | | Arrest of Roger Jason Stone, Jr (at) (Entered: 01/25/2019) |
| 01/25/2019 | 2 | 26 | NOTICE OF TEMPORARY ATTORNEY APPEARANCE: Robert Craig Buschel appearing for Roger Jason Stone, Jr (at) (Entered: 01/25/2019) |
| 01/25/2019 | 3 | 27 | Minute Order for proceedings held before Magistrate Judge Lurana S. Snow: Initial Appearance in Rule 5(c)(3)/Rule 40 Proceedings as to Roger Jason Stone, Jr held on 1/25/2019. Bond recommendation/set: Roger Jason Stone Jr (1) $250,000 PSB. Advised of charges. Waives removal. Removal Ordered. (Digital 11:02:48) (Signed by Magistrate Judge Lurana S. Snow on 1/25/2019). (at) (Entered: 01/25/2019) |
| 01/25/2019 | 4 | 28 | $250,000 PSB Bond Entered as to Roger Jason Stone, Jr Approved by Magistrate Judge Lurana S. Snow. *Please see bond image for conditions of release.* (at) (Additional attachment(s) added on 1/25/2019: # 1 Restricted Bond with 5th Page) (at). (Entered: 01/25/2019) |
| 01/25/2019 | 5 | 37 | WAIVER OF REMOVAL HEARING by Roger Jason Stone, Jr (at) (Entered: 01/25/2019) |
| 01/25/2019 | 6 | 38 | ORDER OF REMOVAL ISSUED to of DISTRICT OF COLUMBIA as to Roger Jason Stone, Jr. Closing Case for Defendant. (Signed by Magistrate Judge Lurana S. Snow on 1/25/2019). *(See attached document for full details).* (at) (Entered: 01/25/2019) |

FILED IN OPEN COURT

JAN 24 2018

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. |
| | * | |
| v. | * | Grand Jury Original |
| | * | |
| ROGER JASON STONE, JR., | * | 18 U.S.C. §§ 1001, 1505, 1512, 2 |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |
| | ******* | |

Case: 1:19-cr-00018
Assigned To : Judge Amy B Jackson
Assign. Date : 01/24/2019
Description: INDICTMENT (B)
Related Case: 18cr215 (ABJ)

## INDICTMENT

The Grand Jury for the District of Columbia charges:

### Introduction

1.     By in or around May 2016, the Democratic National Committee ("DNC") and the Democratic Congressional Campaign Committee ("DCCC") became aware that their computer systems had been compromised by unauthorized intrusions and hired a security company ("Company 1") to identify the extent of the intrusions.

2.     On or about June 14, 2016, the DNC—through Company 1—publicly announced that it had been hacked by Russian government actors.

3.     From in or around July 2016 through in or around November 2016, an organization ("Organization 1"), which had previously posted documents stolen by others from U.S. persons, entities, and the U.S. government, released tens of thousands of documents stolen from the DNC and the personal email account of the chairman of the U.S. presidential campaign of Hillary Clinton ("Clinton Campaign").

3

a.  On or about July 22, 2016, Organization 1 released documents stolen from the DNC.

b.  Between on or about October 7, 2016 and on or about November 7, 2016, Organization 1 released approximately 33 tranches of documents that had been stolen from the personal email account of the Clinton Campaign chairman, totaling over 50,000 stolen documents.

4.  ROGER JASON STONE, JR. was a political consultant who worked for decades in U.S. politics and on U.S. political campaigns. STONE was an official on the U.S. presidential campaign of Donald J. Trump ("Trump Campaign") until in or around August 2015, and maintained regular contact with and publicly supported the Trump Campaign through the 2016 election.

5.  During the summer of 2016, STONE spoke to senior Trump Campaign officials about Organization 1 and information it might have had that would be damaging to the Clinton Campaign. STONE was contacted by senior Trump Campaign officials to inquire about future releases by Organization 1.

6.  By in or around early August 2016, STONE was claiming both publicly and privately to have communicated with Organization 1. By in or around mid-August 2016, Organization 1 made a public statement denying direct communication with STONE. Thereafter, STONE said that his communication with Organization 1 had occurred through a person STONE described as a "mutual friend," "go-between," and "intermediary." STONE also continued to communicate with members of the Trump Campaign about Organization 1 and its intended future releases.

7.  After the 2016 U.S. presidential election, the U.S. House of Representatives Permanent Select Committee on Intelligence ("HPSCI"), the U.S. Senate Select Committee on Intelligence ("SSCI"), and the Federal Bureau of Investigation ("FBI") opened or announced their respective

2

investigations into Russian interference in the 2016 U.S. presidential election, which included investigating STONE's claims of contact with Organization 1.

8.    In response, STONE took steps to obstruct these investigations.  Among other steps to obstruct the investigations, STONE:

      a.    Made multiple false statements to HPSCI about his interactions regarding Organization 1, and falsely denied possessing records that contained evidence of these interactions; and

      b.    Attempted to persuade a witness to provide false testimony to and withhold pertinent information from the investigations.

### Other Relevant Individuals

9.    Person 1 was a political commentator who worked with an online media publication during the 2016 U.S. presidential campaign.  Person 1 spoke regularly with STONE throughout the campaign, including about the release of stolen documents by Organization 1.

10.    Person 2 was a radio host who had known STONE for more than a decade.  In testimony before HPSCI on or about September 26, 2017, STONE described Person 2 (without naming him) as an "intermediary," "go-between," and "mutual friend" to the head of Organization 1.  In a follow-up letter to HPSCI dated October 13, 2017, STONE identified Person 2 by name and claimed Person 2 was the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

### Background

#### STONE's Communications About Organization 1 During the Campaign

11.    By in or around June and July 2016, STONE informed senior Trump Campaign officials that he had information indicating Organization 1 had documents whose release would be

damaging to the Clinton Campaign. The head of Organization 1 was located at all relevant times at the Ecuadorian Embassy in London, United Kingdom.

12.     After the July 22, 2016 release of stolen DNC emails by Organization 1, a senior Trump Campaign official was directed to contact STONE about any additional releases and what other damaging information Organization 1 had regarding the Clinton Campaign. STONE thereafter told the Trump Campaign about potential future releases of damaging material by Organization 1.

13.     STONE also corresponded with associates about contacting Organization 1 in order to obtain additional emails damaging to the Clinton Campaign.

      a.      On or about July 25, 2016, STONE sent an email to Person 1 with the subject line, "Get to [the head of Organization 1]." The body of the message read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly." On or about the same day, Person 1 forwarded STONE's email to an associate who lived in the United Kingdom and was a supporter of the Trump Campaign.

      b.      On or about July 31, 2016, STONE emailed Person 1 with the subject line, "Call me MON." The body of the email read in part that Person 1's associate in the United Kingdom "should see [the head of Organization 1]."

      c.      On or about August 2, 2016, Person 1 emailed STONE. Person 1 wrote that he was currently in Europe and planned to return in or around mid-August. Person 1 stated in part, "Word is friend in embassy plans 2 more dumps. One shortly after I'm back. 2nd in Oct. Impact planned to be very damaging." The phrase "friend in embassy" referred to the head of Organization 1. Person 1 added in the same email, "Time to let more than [the Clinton Campaign chairman] to be exposed as in bed w

4

enemy if they are not ready to drop HRC. That appears to be the game hackers are now about. Would not hurt to start suggesting HRC old, memory bad, has stroke – neither he nor she well. I expect that much of next dump focus, setting stage for Foundation debacle."

14. Starting in early August 2016, after receiving the August 2, 2016 email from Person 1, STONE made repeated statements about information he claimed to have learned from the head of Organization 1.

    a.    On or about August 8, 2016, STONE attended a public event at which he stated, "I actually have communicated with [the head of Organization 1]. I believe the next tranche of his documents pertain to the Clinton Foundation, but there's no telling what the October surprise may be."

    b.    On or about August 12, 2016, STONE stated during an interview that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

    c.    On or about August 16, 2016, STONE stated during an interview that "it became known on this program that I have had some back-channel communication with [Organization 1] and [the head of Organization 1]." In a second interview on or about the same day, STONE stated that he "communicated with [the head of Organization 1]" and that they had a "mutual acquaintance who is a fine gentleman."

    d.    On or about August 18, 2016, STONE stated during a television interview that he had communicated with the head of Organization 1 through an "intermediary, somebody who is a mutual friend."

e.      On or about August 23, 2016, Person 2 asked STONE during a radio interview,
"You've been in touch indirectly with [the head of Organization 1]. . . . Can you
give us any kind of insight? Is there an October surprise happening?" STONE
responded, "Well, first of all, I don't want to intimate in any way that I control or
have influence with [the head of Organization 1] because I do not. . . . We have a
mutual friend, somebody we both trust and therefore I am a recipient of pretty good
information."

15.     Beginning on or about August 19, 2016, STONE exchanged written communications,
including by text message and email, with Person 2 about Organization 1 and what the head of
Organization 1 planned to do.

a.      On or about August 19, 2016, Person 2 sent a text message to STONE that read in
part, "I'm going to have [the head of Organization 1] on my show next Thursday."
On or about August 21, 2016, Person 2 sent another text message to STONE,
writing in part, "I have [the head of Organization 1] on Thursday so I'm completely
tied up on that day."

b.      On or about August 25, 2016, the head of Organization 1 was a guest on Person 2's
radio show for the first time. On or about August 26, 2016, Person 2 sent a text
message to STONE that stated, "[the head of Organization 1] talk[ed] about you
last night." STONE asked what the head of Organization 1 said, to which Person 2
responded, "He didn't say anything bad we were talking about how the Press is
trying to make it look like you and he are in cahoots."

c.      On or about August 27, 2016, Person 2 sent text messages to STONE that said, "We
are working on a [head of Organization 1] radio show," and that he (Person 2) was

6

"in charge" of the project. In a text message sent later that day, Person 2 added, "[The head of Organization 1] has kryptonite on Hillary."

d.    On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]." Person 2 responded "Ok," and added in a later text message, "[j]ust remember do not name me as your connection to [the head of Organization 1] you had one before that you referred to."

       i.    On or about the same day, September 18, 2016, STONE emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State. STONE stated, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30—particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

       ii.    On or about September 19, 2016, STONE texted Person 2 again, writing, "Pass my message . . . to [the head of Organization 1]." Person 2 responded, "I did." On or about September 20, 2016, Person 2 forwarded the request to a friend who was an attorney with the ability to contact the head of Organization 1. Person 2 blind-copied STONE on the forwarded email.

e.    On or about September 30, 2016, Person 2 sent STONE via text message a photograph of Person 2 standing outside the Ecuadorian Embassy in London where the head of Organization 1 was located.

f.　On or about October 1, 2016, which was a Saturday, Person 2 sent STONE text messages that stated, "big news Wednesday . . . now pretend u don't know me . . . Hillary's campaign will die this week." In the days preceding these messages, the press had reported that the head of Organization 1 planned to make a public announcement on or about Tuesday, October 4, 2016, which was reported to be the ten-year anniversary of the founding of Organization 1.

g.　On or about October 2, 2016, STONE emailed Person 2, with the subject line "WTF?," a link to an article reporting that Organization 1 was canceling its "highly anticipated Tuesday announcement due to security concerns." Person 2 responded to STONE, "head fake."

h.　On or about the same day, October 2, 2016, STONE texted Person 2 and asked, "Did [the head of Organization 1] back off." On or about October 3, 2016, Person 2 initially responded, "I can't tal[k] about it." After further exchanges with STONE, Person 2 said, "I think it[']s on for tomorrow." Person 2 added later that day, "Off the Record Hillary and her people are doing a full-court press they [sic] keep [the head of Organization 1] from making the next dump . . . That's all I can tell you on this line . . . Please leave my name out of it."

16.　In or around October 2016, STONE made statements about Organization 1's future releases, including statements similar to those that Person 2 made to him. For example:

a.　On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night. The payload is still coming."

b.　Also on or about October 3, 2016, STONE received an email from a reporter who had connections to a high-ranking Trump Campaign official that asked, "[the head

of Organization 1] – what's he got? Hope it's good." STONE responded in part, "It is. I'd tell [the high-ranking Trump Campaign official] but he doesn't call me back."

     c.    On or about October 4, 2016, the head of Organization 1 held a press conference but did not release any new materials pertaining to the Clinton Campaign. Shortly afterwards, STONE received an email from the high-ranking Trump Campaign official asking about the status of future releases by Organization 1. STONE answered that the head of Organization 1 had a "[s]erious security concern" but that Organization 1 would release "a load every week going forward."

     d.    Later that day, on or about October 4, 2016, the supporter involved with the Trump Campaign asked STONE via text message if he had "hear[d] anymore from London." STONE replied, "Yes - want to talk on a secure line - got Whatsapp?" STONE subsequently told the supporter that more material would be released and that it would be damaging to the Clinton Campaign.

17.    On or about October 7, 2016, Organization 1 released the first set of emails stolen from the Clinton Campaign chairman. Shortly after Organization 1's release, an associate of the high-ranking Trump Campaign official sent a text message to STONE that read "well done." In subsequent conversations with senior Trump Campaign officials, STONE claimed credit for having correctly predicted the October 7, 2016 release.

<u>The Investigations</u>

18.    In or around 2017, government officials publicly disclosed investigations into Russian interference in the 2016 U.S. presidential election and possible links to individuals associated with the campaigns.

a.    On or about January 13, 2017, the chairman and vice chairman of SSCI announced the committee would conduct an inquiry that would investigate, among other things, any intelligence regarding links between Russia and individuals associated with political campaigns, as well as Russian cyber activity and other "active measures" directed against the United States in connection with the 2016 election.

b.    On or about January 25, 2017, the chairman and ranking member of HPSCI announced that HPSCI had been conducting an inquiry similar to SSCI's.

c.    On or about March 20, 2017, the then-director of the FBI testified at a HPSCI hearing and publicly disclosed that the FBI was investigating Russian interference in the 2016 election and possible links and coordination between the Trump Campaign and the Russian government.

d.    By in or around August 2017, news reports stated that a federal grand jury had opened an investigation into matters relating to Russian government efforts to interfere in the 2016 election, including possible links and coordination between the Trump Campaign and the Russian government.

### STONE's False Testimony to HPSCI

19.    In or around May 2017, HPSCI sent a letter requesting that STONE voluntarily appear before the committee and produce:

> Any documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles) that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters.

On or about May 22, 2017, STONE caused a letter to be submitted to HPSCI stating that "Mr.

Stone has no documents, records, or electronically stored information, regardless of form, other than those widely available that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters."

20.     On or about September 26, 2017, STONE testified before HPSCI in Washington, D.C. as part of the committee's ongoing investigation. In his opening statement, STONE stated, "These hearings are largely based on a yet unproven allegation that the Russian state is responsible for the hacking of the DNC and [the Clinton Campaign chairman] and the transfer of that information to [Organization 1]." STONE further stated that "[m]embers of this Committee" had made certain "assertions against me which must be rebutted here today," which included "[t]he charge that I knew in advance about, and predicted, the hacking of Clinton campaign chairman['s] email, [and] that I had advanced knowledge of the source or actual content of the [Organization 1] disclosures regarding Hillary Clinton."

21.     In the course of his HPSCI testimony, STONE made deliberately false and misleading statements to the committee concerning, among other things, his possession of documents pertinent to HPSCI's investigation; the source for his early August 2016 statements about Organization 1; requests he made for information from the head of Organization 1; his communications with his identified intermediary; and his communications with the Trump Campaign about Organization 1.

<u>STONE's False and Misleading Testimony About His Possession of Documents Pertinent to HPSCI's Investigation</u>

22.     During his HPSCI testimony, STONE was asked, "So you have no emails to anyone concerning the allegations of hacked documents . . . or any discussions you have had with third parties about [the head of Organization 1]? You have no emails, no texts, no documents whatsoever, any kind of that nature?" STONE falsely and misleadingly answered, "That is correct.

Not to my knowledge."

23.     In truth and in fact, STONE had sent and received numerous emails and text messages during the 2016 campaign in which he discussed Organization 1, its head, and its possession of hacked emails. At the time of his false testimony, STONE was still in possession of many of these emails and text messages, including:

a.     The email from STONE to Person 1 on or about July 25, 2016 that read in part, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly.";

b.     The email from STONE to Person 1 on or about July 31, 2016 that said an associate of Person 1 "should see [the head of Organization 1].";

c.     The email from Person 1 to STONE on or about August 2, 2016 that stated in part, "Word is friend in embassy plans 2 more dumps. One shortly after I'm back. 2nd in Oct. Impact planned to be very damaging.";

d.     Dozens of text messages and emails, beginning on or about August 19, 2016 and continuing through the election, between STONE and Person 2 in which they discussed Organization 1 and the head of Organization 1;

e.     The email from STONE on or about October 3, 2016 to the supporter involved with the Trump Campaign, which read in part, "Spoke to my friend in London last night. The payload is still coming."; and

f.     The emails on or about October 4, 2016 between STONE and the high-ranking member of the Trump Campaign, including STONE's statement that Organization 1 would release "a load every week going forward."

24.     By falsely claiming that he had no emails or text messages in his possession that referred to the head of Organization 1, STONE avoided providing a basis for HPSCI to subpoena records in his possession that could have shown that other aspects of his testimony were false and misleading.

<u>STONE's False and Misleading Testimony About His Early August 2016 Statements</u>

25.     During his HPSCI testimony on or about September 26, 2017, STONE was asked to explain his statements in early August 2016 about being in contact with the head of Organization 1. STONE was specifically asked about his statement on or about August 8, 2016 that "I've actually communicated with [the head of Organization 1]," as well as his statement on or about August 12, 2016 that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

26.     STONE responded that his public references to having a means of contacting Organization 1 referred exclusively to his contact with a journalist, who STONE described as a "go-between, as an intermediary, as a mutual friend" of the head of Organization 1.  STONE stated that he asked this individual, his intermediary, "to confirm what [the head of Organization 1] ha[d] tweeted, himself, on July 21st, that he ha[d] the Clinton emails and that he [would] publish them."  STONE further stated that the intermediary "was someone I knew had interviewed [the head of Organization 1].  And I merely wanted confirmation of what he had tweeted on the 21st."  STONE declined to tell HPSCI the name of this "intermediary" but provided a description in his testimony that was consistent with Person 2.

27.     On or about October 13, 2017, STONE caused a letter to be submitted to HPSCI that identified Person 2 by name as the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

28.     STONE's explanation of his August 2016 statements about communicating with the head of Organization 1 was false and misleading.  In truth and in fact, the first time Person 2 interviewed the head of Organization 1 was on or about August 25, 2016, after STONE made his August 8 and August 12, 2016 public statements.   Similarly, at the time STONE made his August 2016 statements, STONE had directed Person 1—not Person 2—to contact the head of Organization 1. And Person 1—not Person 2—had told STONE in advance of STONE's August 8 and August 12, 2016 public statements that "[w]ord is friend in embassy plans 2 more dumps," including one in October.  At no time did STONE identify Person 1 to HPSCI as another individual STONE contacted to serve as a "go-between," "intermediary," or other source of information from Organization 1.  STONE also never disclosed his exchanges with Person 1 when answering HPSCI's questioning about STONE's August 8 and August 12, 2016 statements.

<u>STONE's False and Misleading Testimony About Requests He Made for Information from the Head of Organization 1</u>

29.     During his HPSCI testimony, STONE was asked, "[W]hat was the extent of the communication with [the intermediary]?"  STONE replied, "I asked him to confirm . . . that the tweet of [the head of Organization 1] of the 21st was accurate, that they did in fact have . . . Hillary Clinton emails and that they would release them."  STONE was then asked, "Did you ask [the intermediary] to communicate anything else to [the head of Organization 1]?"  STONE falsely and misleadingly responded, "I did not."  STONE was then asked, "Did you ask [the intermediary] to do anything on your own behalf?"  STONE falsely and misleadingly responded, "I did not."

30.     In truth and in fact, STONE directed both Person 1 and Person 2 to pass on requests to the head of Organization 1 for documents that STONE believed would be damaging to the Clinton Campaign.  For example:

      a.      As described above, on or about July 25, 2016, STONE sent Person 1 an email that

14

read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and

get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."

b.    On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]," and then emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State. STONE added, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30— particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

c.    On or about September 19, 2016, STONE texted Person 2 again, writing "Pass my message . . . to [the head of Organization 1]." Person 2 responded, "I did," and the next day Person 2, on an email blind-copied to STONE, forwarded the request to an attorney who had the ability to contact the head of Organization 1.

<u>STONE's False and Misleading Testimony About Communications with His Identified Intermediary</u>

31.    During his HPSCI testimony, STONE was asked repeatedly about his communications with the person he identified as his intermediary. STONE falsely and misleadingly stated that he had never communicated with his intermediary in writing in any way. During one exchange, STONE falsely and misleadingly claimed only to have spoken with the intermediary telephonically:

Q:    [H]ow did you communicate with the intermediary?

A:    Over the phone.

Q:    And did you have any other means of communicating with the intermediary?

A:    No.

Q:    No text messages, no – none of the list, right?

15

A:      No.

Later during his testimony, STONE again falsely denied ever communicating with his intermediary in writing:

Q:      So you never communicated with your intermediary in writing in any way?

A:      No.

Q:      Never emailed him or texted him?

A:      He's not an email guy.

Q:      So all your conversations with him were in person or over the phone.

A:      Correct.

32.     In truth and in fact, as described above, STONE and Person 2 (who STONE identified to HPSCI as his intermediary) engaged in frequent written communication by email and text message. STONE also engaged in frequent written communication by email and text message with Person 1, who also provided STONE with information regarding Organization 1.

33.     Written communications between STONE and Person 1 and between STONE and Person 2 continued through STONE's HPSCI testimony. Indeed, on or about September 26, 2017—the day that STONE testified before HPSCI and denied having ever sent or received emails or text messages from Person 2—STONE and Person 2 exchanged over thirty text messages.

34.     Certain electronic messages between STONE and Person 1 and between STONE and Person 2 would have been material to HPSCI. For example:

a.      In or around July 2016, STONE emailed Person 1 to "get to" the head of Organization 1 and obtain the pending emails.

b.      In or around September 2016, STONE sent messages directing Person 2 to pass a request to the head of Organization 1.

c.      On or about January 6, 2017, Person 2 sent STONE an email that had the subject

16

line "Back channel bs." In the email, Person 2 wrote, "Well I have put together timelines[] and you [] said you have a back-channel way back a month before I had [the head of Organization 1] on my show . . . I have never had a conversation with [the head of Organization 1] other than my radio show . . . I have pieced it all together . . . so you may as well tell the truth that you had no back-channel or there's the guy you were talking about early August."

STONE's False and Misleading Testimony About Communications with the Trump Campaign

35. During his HPSCI testimony, STONE was asked, "did you discuss your conversations with the intermediary with anyone involved in the Trump campaign?" STONE falsely and misleadingly answered, "I did not." In truth and in fact, and as described above, STONE spoke to multiple individuals involved in the Trump Campaign about what he claimed to have learned from his intermediary to Organization 1, including the following:

 a. On multiple occasions, STONE told senior Trump Campaign officials about materials possessed by Organization 1 and the timing of future releases.

 b. On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night. The payload is still coming."

 c. On or about October 4, 2016, STONE told a high-ranking Trump Campaign official that the head of Organization 1 had a "[s]erious security concern" but would release "a load every week going forward."

**Attempts to Prevent Person 2 from Contradicting STONE's False Statements to HPSCI**

36. On or about October 19, 2017, STONE sent Person 2 an excerpt of his letter to HPSCI that identified Person 2 as his "intermediary" to Organization 1. STONE urged Person 2, if asked by HPSCI, to falsely confirm what STONE had previously testified to, including that it was Person 2

who provided STONE with the basis for STONE's early August 2016 statements about contact with Organization 1. Person 2 repeatedly told STONE that his testimony was false and told him to correct his testimony to HPSCI. STONE did not do so. STONE then engaged in a prolonged effort to prevent Person 2 from contradicting STONE's false statements to HPSCI.

37. In or around November 2017, Person 2 received a request from HPSCI to testify voluntarily before the committee. After being contacted by HPSCI, Person 2 spoke and texted repeatedly with STONE. In these discussions, STONE sought to have Person 2 testify falsely either that Person 2 was the identified intermediary or that Person 2 could not remember what he had told STONE. Alternatively, STONE sought to have Person 2 invoke his Fifth Amendment right against self-incrimination. For example:

  a.  On or about November 19, 2017, in a text message to STONE, Person 2 said that his lawyer wanted to see him (Person 2). STONE responded, "'Stonewall it. Plead the fifth. Anything to save the plan' . . . Richard Nixon." On or about November 20, 2017, Person 2 informed HPSCI that he declined HPSCI's request for a voluntary interview.

  b.  On or about November 21, 2017, Person 2 texted STONE, "I was told that the house committee lawyer told my lawyer that I will be getting a subpoena." STONE responded, "That was the point at which your lawyers should have told them you would assert your 5th Amendment rights if compelled to appear."

  c.  On or about November 28, 2017, Person 2 received a subpoena compelling his testimony before HPSCI. Person 2 informed STONE of the subpoena.

  d.  On or about November 30, 2017, STONE asked Person 1 to write publicly about Person 2. Person 1 responded, "Are you sure you want to make something out of

18

this now? Why not wait to see what [Person 2] does. You may be defending yourself too much—raising new questions that will fuel new inquiries. This may be a time to say less, not more." STONE responded by telling Person 1 that Person 2 "will take the 5th—but let's hold a day."

e.    On multiple occasions, including on or about December 1, 2017, STONE told Person 2 that Person 2 should do a "Frank Pentangeli" before HPSCI in order to avoid contradicting STONE's testimony. Frank Pentangeli is a character in the film *The Godfather: Part II*, which both STONE and Person 2 had discussed, who testifies before a congressional committee and in that testimony claims not to know critical information that he does in fact know.

f.    On or about December 1, 2017, STONE texted Person 2, "And if you turned over anything to the FBI you're a fool." Later that day, Person 2 texted STONE, "You need to amend your testimony before I testify on the 15th." STONE responded, "If you testify you're a fool. Because of tromp I could never get away with a certain [*sic*] my Fifth Amendment rights but you can. I guarantee you you are the one who gets indicted for perjury if you're stupid enough to testify."

38.    On or about December 12, 2017, Person 2 informed HPSCI that he intended to assert his Fifth Amendment privilege against self-incrimination if required to appear by subpoena. Person 2 invoked his Fifth Amendment privilege in part to avoid providing evidence that would show STONE's previous testimony to Congress was false.

39.    Following Person 2's invocation of his Fifth Amendment privilege not to testify before HPSCI, STONE and Person 2 continued to have discussions about the various investigations into Russian interference in the 2016 election and what information Person 2 would provide to

investigators. During these conversations, STONE repeatedly made statements intended to prevent Person 2 from cooperating with the investigations. For example:

a.   On or about December 24, 2017, Person 2 texted STONE, "I met [the head of Organization 1] for f[i]rst time this yea[r] sept 7 . . . docs prove that. . . . You should be honest w fbi . . . there was no back channel . . . be honest." STONE replied approximately two minutes later, "I'm not talking to the FBI and if your smart you won't either."

b.   On or about April 9, 2018, STONE wrote in an email to Person 2, "You are a rat. A stoolie. You backstab your friends-run your mouth my lawyers are dying Rip you to shreds." STONE also said he would "take that dog away from you," referring to Person 2's dog. On or about the same day, STONE wrote to Person 2, "I am so ready. Let's get it on. Prepare to die [expletive]."

c.   On or about May 21, 2018, Person 2 wrote in an email to STONE, "You should have just been honest with the house Intel committee . . . you've opened yourself up to perjury charges like an idiot." STONE responded, "You are so full of [expletive]. You got nothing. Keep running your mouth and I'll file a bar complaint against your friend [the attorney who had the ability to contact the head of Organization 1]."

20

## COUNT ONE
### (Obstruction of Proceeding)

40.    Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

41.    From in or around May 2017 through at least December 2017, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., corruptly influenced, obstructed, impeded, and endeavored to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which any inquiry and investigation is being had by either House, and any committee of either House and any joint committee of the Congress, to wit: STONE testified falsely and misleadingly at a HPSCI hearing in or around September 2017; STONE failed to turn over and lied about the existence of responsive records to HPSCI's requests about documents; STONE submitted and caused to be submitted a letter to HPSCI falsely and misleadingly describing communications with Person 2; and STONE attempted to have Person 2 testify falsely before HPSCI or prevent him from testifying.

All in violation of Title 18, United States Code, Sections 1505 and 2.

## COUNTS TWO THROUGH SIX
### (False Statements)

42.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

43.     On or about September 26, 2017, within the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, the defendant ROGER JASON STONE, JR., knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations, to wit:

| Count | False Statement |
|:---:|:---|
| 2 | STONE testified falsely that he did not have emails with third parties about the head of Organization 1, and that he did not have any documents, emails, or text messages that refer to the head of Organization 1. |
| 3 | STONE testified falsely that his August 2016 references to being in contact with the head of Organization 1 were references to communications with a single "go-between," "mutual friend," and "intermediary," who STONE identified as Person 2. |
| 4 | STONE testified falsely that he did not ask the person he referred to as his "go-between," "mutual friend," and "intermediary," to communicate anything to the head of Organization 1 and did not ask the intermediary to do anything on STONE's behalf. |
| 5 | STONE testified falsely that he and the person he referred to as his "go-between," "mutual friend," and "intermediary" did not communicate via text message or email about Organization 1. |
| 6 | STONE testified falsely that he had never discussed his conversations with the person he referred to as his "go-between," "mutual friend," and "intermediary" with anyone involved in the Trump Campaign. |

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT SEVEN
### (Witness Tampering)

44.    Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

45.    Between in or around September 2017 and present, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., knowingly and intentionally corruptly persuaded and attempted to corruptly persuade another person, to wit: Person 2, with intent to influence, delay, and prevent the testimony of any person in an official proceeding.

All in violation of Title 18, United States Code, Section 1512(b)(1).

_____

Robert S. Mueller, III
Special Counsel
U.S. Department of Justice

A TRUE BILL:



Foreperson

Date: January 24, 2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 19-6039 SNOW

UNITED STATES OF AMERICA,
Plaintiff,

**NOTICE OF TEMPORARY
APPEARANCE AS COUNSEL**

v.

Roger Stone
Defendant.

COMES NOW Robert Buschel and

files this temporary appearance as counsel for the above named defendant(s) at initial appearance.

This appearance is made with the **understanding** that the undersigned counsel will fulfill any

**obligations imposed** by the Court such as **preparing and filing documents** necessary to

collateralize any personal surety bond which may be set.

Counsel's Name (**Printed**): Robert Buschel

Counsel's Signature:

Address (include City/State/Zip Code):
100 SE 3d Ave Suite 1300
Ft. L FL 33394

Telephone: 954-530-5301   Florida Bar Number: 006 3436

Date: 1/24/19

26

# COURT MINUTES

## U.S. MAGISTRATE JUDGE LURANA S.SNOW - FORT LAUDERDALE, FLORIDA

DEFT: ROGER JASON STONE, JR. (J)#          CASE NO: 19-6039-SNOW

AUSA: Jared Strauss  *Aaron Zelinsky (DC)*     ATTY: Robert ~~Bushell~~  *Busdid present*  *Bruce Rogow*
(If applicable-appeals colloquy)

AGENT: _____          VIOL: REMOVAL: Washington,DC-18:1001, 1505, 1512,2

PROCEEDING: INITIAL APPEARANCE          RECOMMENDED BOND: $250,000 PSB

BOND HEARING HELD - yes/ no          COUNSEL APPOINTED: _____

BOND SET @: $250,000 PSB          To be cosigned by: _____

☑ Do not violate any law.          *A—advised of charges.*

☑ Appear in court as directed.          *A— Waives removal*

☑ Surrender and / or do not obtain passports / travel          *Removal ordered*
documents.

☑ Rpt to PTS as directed or _____ x's a week/month by
phone; _____ x's a week/month in person.

☑ Random urine testing by Pretrial Services. ✓
Treatment as deemed necessary.

✓ *See doctors as per PTS report*
☐ Maintain or seek full - time employment.

☑ No contact with victims / witnesses.

☐ No firearms.
✓ *do not change address w/o permission*
☐ Curfew: _____

☐✓ Travel extended to: *SDFL, SDNY + DC + EDNY + EDVIRGINIA.*

✓ *Not to sell or encumber real properties .*
☑ ~~Halfway House~~

| NEXT COURT APPEARANCE: | DATE: | TIME: | JUDGE: | PLACE: |
|---|---|---|---|---|
| INQUIRY RE COUNSEL: | | | | |
| PTD/BOND HEARING: | | | | |
| PRELIM/ARRAIGN. OR REMOVAL: | | | | |

CHECK IF APPLICABLE_____:  For the reasons stated by counsel for the Defendant and finding that the ends of justice served by granting the ore tenus motion for continuance to hire counsel outweigh the best interests of the public & the Defendant in a Speedy Trial, the Court finds that the period of time from today, through and including _____, shall be deemed excludable in accordance with the provisions of the Speedy Trial Act, 18 USC 3161 et seq..

DATE: 1-25-19   TIME: 11:00am   DAR: 11:02:48   PAGE: (5)

*10m*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### APPEARANCE BOND:_____

### CASE NO.:___19-6039-SNOW_____
Deft# _____

UNITED STATES OF AMERICA
Plaintiff,                                         JAIL #_____

v.    ROGER JASON STONE JR.
Defendant,
_____/

I, the undersigned defendant and I or we, the undersigned sureties, jointly and severally acknowledge that we and our personal representatives, jointly and severally, are bound to pay the United States of America, the sum of $__250,000 PSB_____.

## STANDARD CONDITIONS OF BOND

The conditions of this bond are that the defendant:

1.  Shall appear before this court and at such other places as the defendant may be required to appear, in accordance with any and all orders and directions relating to the defendant's appearance in this case, including appearance for violation of a condition of the defendant's release as may be ordered or notified by this court or any other United States District Court to which the defendant may be held to answer or the cause transferred.  The defendant is to abide by any judgment entered in such matter by surrendering to serve any sentence imposed and obeying any order or direction in connection with such judgment. This is a continuing bond, including any proceeding on appeal or review, which shall remain in full force and effect until such time as the court shall order otherwise.

2.  May not at any time, for any reason whatever, leave the Southern District of Florida or other District to which the case may be removed or transferred after he or she has appeared in such District pursuant to the conditions of this bond, without first obtaining written permission from the court, except that a defendant ordered removed or transferred to another district may travel to that district as required for court appearances and trial preparation upon written notice to the Clerk of this court or the court to which the case has been removed or transferred. The Southern District of Florida  consists of the following counties: **Monroe, Miami-Dade, Broward, Palm Beach, Martin, St. Lucie, Indian River, Okeechobee, and Highlands.**

3.  May not change his or her present address as recorded on this bond without prior permission in writing from the court.

4.  Is required to appear in court at all times as required by notice given by the court or its clerk to the address on this bond or in open court or to the address as changed by permission from the court.  The defendant is required to ascertain from the Clerk of Court or defense counsel the time and place of all scheduled proceedings on the case.  In no event may a defendant assume that his or her case has been dismissed unless the court has entered an order of dismissal.

5. The defendant must cooperate with law enforcement officers in the collection of a DNA sample if the collection is required by 42 U.S.C. Section 14135a.

6.  Shall not commit any act in violation of state or federal laws.

DEFENDANT:   **STONE**

**CASE NUMBER:**   **19-6039-SNOW**

**PAGE TWO**

## SPECIAL CONDITIONS OF BOND

In addition to compliance with the previously stated conditions of bond, the defendant must comply with the special conditions checked below:

✓ a. Surrender all passports and travel documents, if any, to the Pretrial Services Office and not obtain any travel documents during the pendency of the case;

✓ b. Report to Pretrial Services as follows: (✓) *as directed or* _____ *times in person and* _____ *times by telephone*;

✓ c. Submit to substance abuse testing and/or treatment;

___ d. Refrain from excessive use of alcohol, or any use of a narcotic drug or other controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802), without a prescription by a licensed medical practitioner;

___ e. Participate in mental health assessment and/or treatment;

___ f. Participate and undergo a sex offense specific evaluation and treatment;

___ g. Maintain or actively seek full-time employment;

___ h. Maintain or begin an educational program;

✓ i. Avoid all contact with victims of or witnesses to the crimes charged, except through counsel;

___ j. Refrain from possessing a firearm, destructive device or other dangerous weapons;

✓ k. None of the signatories may sell, pledge, mortgage, hypothecate, encumber, etc., any real property they own, until the bond is discharged, or otherwise modified by the Court;

___ l. May not visit commercial transportation establishment: *airports, seaport/marinas, commercial bus terminals, train stations, etc.*;

___ m. No access to the internet via any type of connectivity device (*i.e. computers, pda's, cellular phones, tv's*), and follow instructions as outlined in the agreement waiver provided to you by Pretrial Services;

___ n. **HOME CONFINEMENT PROGRAM**  The defendant shall participate in one of the following home confinement program components and abide by all the requirements of the program which ( ) **will not** or ( ) **will include electronic monitoring or other location verification system, paid for by the defendant based upon his/her ability to pay** ( ) or **paid for by Pretrial Services** ( ).

    _____ **Curfew:** You are restricted to your residence every day from _____ to _____, or as directed by the Court.

    _____ **Home Detention:** You are restricted to your residence at all times except for: ( ) **medical needs or treatment,** ( ) **court appearances,** ( ) **attorney visits or court ordered obligations, and** ( ) **other** _____.

___ o. **HALFWAY HOUSE PLACEMENT**  The defendant shall reside at a halfway house or community corrections center and abide by all the rules and regulations of the program.
You are restricted to the halfway house at all times except for: ( ) **employment;** ( ) **education;** ( ) **religious services;** ( ) **medical, substance abuse, or mental health treatment;** ( ) **attorney visits;** ( ) **court appearances;** ( ) **court ordered obligations;** ( ) **reporting to Pretrial Services; and** ( ) **other** _____.

✓ p. May travel to and from: _SD/FL, SDNY + DOC_ , and must notify Pretrial Services of travel plans before leaving and upon return.  _EDNY + EDVIRGINIA._

✓ q. Comply with the following additional conditions of bond:
    _appear in Court as directed, do not change address w/o permission,_
    _do not commit further state or federal crimes,_
    _see doctors as per PTS report._

DEFENDANT:___STONE_____

CASE NUMBER:___19-6039-SNOW_____

PAGE THREE

## PENALTIES AND SANCTIONS APPLICABLE TO DEFENDANT

Violation of any of the foregoing conditions of release may result in the immediate issuance of a warrant for the defendant's arrest, a revocation of release, an order of detention, as provided in 18 U.S.C. § 3148, forfeiture of any bail posted, and a prosecution for contempt as provided in 18 U.S.C. § 401, which could result in a possible term of imprisonment or a fine.

The commission of any offense while on pretrial release may result in an additional sentence upon conviction for such offense to a term of imprisonment of not more than ten years, if the offense is a felony; or a term of imprisonment of not more than one year, if the offense is a misdemeanor. This sentence shall be consecutive to any other sentence and must be imposed in addition to the sentence received for the offense itself.

Title 18 U.S.C. § 1503 makes it a criminal offense punishable by up to five years of imprisonment and a $250,000 fine to intimidate or attempt to intimidate a witness, juror or officer of the court; 18 U.S.C. § 1510 makes it a criminal offense punishable by up to five years of imprisonment and a $250,000 fine to obstruct a criminal investigation; 18 U.S.C. § 1512 makes it a criminal offense punishable by up to ten years of imprisonment and a $250,000 fine to tamper with a witness, victim or informant; and 18 U.S.C. § 1513 makes it a criminal offense punishable by up to ten years of imprisonment and a $250,000 fine to retaliate against a witness, victim or informant, or threaten to do so.

It is a criminal offense under 18 U.S.C. § 3146, if after having been released, the defendant knowingly fails to appear as required by the conditions of release, or to surrender for the service of sentence pursuant to a court order. If the defendant was released in connection with a charge of, or while awaiting sentence, surrender for the service of a sentence, or appeal or certiorari after conviction for:

(1)     an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more the defendant shall be fined not more than $250,000 or imprisoned for not more than ten years, or both;

(2)     an offense punishable by imprisonment for a term of five years or more, but less than fifteen years, the defendant shall be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3)     any other felony, the defendant shall be fined not more than $250,000 or imprisoned not more than two years, or both;

(4)     a misdemeanor, the defendant shall be fined not more that $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender shall be consecutive to the sentence of imprisonment for any other offense. In addition, a failure to appear may result in the forfeiture of any bail posted, which means that the defendant will be obligated to pay the full amount of the bond, which may be enforced by all applicable laws of the United States.

DEFENDANT:___STONE_____

CASE NUMBER:___19-6039-SNOW_____

## PAGE FOUR

### PENALTIES AND SANCTIONS APPLICABLE TO SURETIES

Violation by the defendant of any of the foregoing conditions of release will result in an immediate obligation by the surety or sureties to pay the full amount of the bond. Forfeiture of the bond for any breach of one or more conditions may be declared by a judicial officer of any United States District Court having cognizance of the above entitled matter at the time of such breach, and if the bond is forfeited and the forfeiture is not set aside or remitted, judgment may be entered upon motion in such United States District Court against each surety jointly and severally for the amount of the bond, together with interest and costs, and execution may be issued and payment secured as provided by the Federal Rules of Criminal Procedure and other laws of the United States.

### SIGNATURES

I have carefully read and I understand this entire appearance bond consisting of four pages, or it as been read to me, and, if necessary, translated into my native language, and I know that I am obligated by law to comply with all of the terms of this bond. I promise to obey all conditions of this bond, to appear in court as required, and to surrender for service of any sentence imposed. I am aware of the penalties and sanctions outlined in this bond for violations of the terms of the bond.

If I am an agent acting for or on behalf of a corporate surety, I further represent that I am a duly authorized agent for the corporate surety and have full power to execute this bond in the amount stated.

**(NOTE: Page 5 of this form MUST be completed before the bond will be accepted for filing.)**

### DEFENDANT

Signed this __25__ day of __January_____, **2019** at Ft. Lauderdale, Florida.

Signed and acknowledged before me:     DEFENDANT:(Signature)_____

WITNESS:_____     FT Lauderdale     FLA

                                                 city                          state

### CORPORATE SURETY

Signed this _____ day of _____, **2019**, at _____, Florida.

SURETY:_____     AGENT:(Signature)_____

_____         _____     PRINT NAME:_____

     city                    state

### INDIVIDUAL SURETIES

Signed this__day of _____, **20**19 , at _FTL__, Florida.     Signed this__day of _____, **2019** at _FTL__, Florida.

SURETY:(Signature)_____     SURETY:(Signature)_____

PRINT NAME:_____     PRINT NAME:_____

RELATIONSHIP TO                 RELATIONSHIP TO

DEFENDANT:_____     DEFENDANT:_____

_____        _____     _____        _____

     city               state                   city                 state

SURETY (Signature)_____     SURETY (Signature)_____

PRINT NAME:_____     PRINT NAME:_____

RELATIONSHIP:_____     RELATIONSHIP _____

City/STATE_____     City/STATE_____

### APPROVAL BY COURT

Date:___1-25-19_____

_____

**UNITED STATES MAGISTRATE JUDGE**   31

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### APPEARANCE BOND:_____

### CASE NO.:___19-6039-SNOW_____
Deft# _____

UNITED STATES OF AMERICA
             Plaintiff,                          JAIL #_____

v.     ROGER JASON STONE JR.
              Defendant,
_____/

I, the undersigned defendant and I or we, the undersigned sureties, jointly and severally acknowledge that we and our personal representatives, jointly and severally, are bound to pay the United States of America, the sum of $ 250,000 PSB _____.

## STANDARD CONDITIONS OF BOND

The conditions of this bond are that the defendant:

1. Shall appear before this court and at such other places as the defendant may be required to appear, in accordance with any and all orders and directions relating to the defendant's appearance in this case, including appearance for violation of a condition of the defendant's release as may be ordered or notified by this court or any other United States District Court to which the defendant may be held to answer or the cause transferred. The defendant is to abide by any judgment entered in such matter by surrendering to serve any sentence imposed and obeying any order or direction in connection with such judgment. This is a continuing bond, including any proceeding on appeal or review, which shall remain in full force and effect until such time as the court shall order otherwise.

2. May not at any time, for any reason whatever, leave the Southern District of Florida or other District to which the case may be removed or transferred after he or she has appeared in such District pursuant to the conditions of this bond, without first obtaining written permission from the court, except that a defendant ordered removed or transferred to another district may travel to that district as required for court appearances and trial preparation upon written notice to the Clerk of this court or the court to which the case has been removed or transferred. The Southern District of Florida consists of the following counties: **Monroe, Miami-Dade, Broward, Palm Beach, Martin, St. Lucie, Indian River, Okeechobee, and Highlands.**

3. May not change his or her present address as recorded on this bond without prior permission in writing from the court.

4. Is required to appear in court at all times as required by notice given by the court or its clerk to the address on this bond or in open court or to the address as changed by permission from the court. The defendant is required to ascertain from the Clerk of Court or defense counsel the time and place of all scheduled proceedings on the case. In no event may a defendant assume that his or her case has been dismissed unless the court has entered an order of dismissal.

5. The defendant must cooperate with law enforcement officers in the collection of a DNA sample if the collection is required by 42 U.S.C. Section 14135a.

6. Shall not commit any act in violation of state or federal laws.

DEFENDANT: __STONE_____

CASE NUMBER: __19-6039-SNOW_____

PAGE TWO

### SPECIAL CONDITIONS OF BOND

In addition to compliance with the previously stated conditions of bond, the defendant must comply with the special conditions checked below:

__✓__a. Surrender all passports and travel documents, if any, to the Pretrial Services Office and not obtain any travel documents during the pendency of the case;

__✓__b. Report to Pretrial Services as follows: (✓) *as directed or* _____ *times in person and* _____ *times by telephone*;

__✓__c. Submit to substance abuse testing and/or treatment;

____d. Refrain from excessive use of alcohol, or any use of a narcotic drug or other controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802), without a prescription by a licensed medical practitioner;

____e. Participate in mental health assessment and/or treatment;

____f. Participate and undergo a sex offense specific evaluation and treatment;

____g. Maintain or actively seek full-time employment;

____h. Maintain or begin an educational program;

__✓__i. Avoid all contact with victims of or witnesses to the crimes charged, except through counsel;

____j. Refrain from possessing a firearm, destructive device or other dangerous weapons;

__✓__k. None of the signatories may sell, pledge, mortgage, hypothecate, encumber, etc., any real property they own, until the bond is discharged, or otherwise modified by the Court;

____l. May not visit commercial transportation establishment: *airports, seaport/marinas, commercial bus terminals, train stations, etc.*;

____m. No access to the internet via any type of connectivity device (*i.e. computers, pda's, cellular phones, tv's*), and follow instructions as outlined in the agreement waiver provided to you by Pretrial Services;

____n. **HOME CONFINEMENT PROGRAM**   The defendant shall participate in one of the following home confinement program components and abide by all the requirements of the program which (   ) **will not** or (   ) **will include electronic monitoring or other location verification system, paid for by the defendant** *based upon his/her ability to pay* (   ) **or paid for by Pretrial Services (   ).**

_____ **Curfew:** You are restricted to your residence every day from _____ to _____, or as directed by the Court.

_____ **Home Detention:** You are restricted to your residence at all times except for: (  ) **medical needs or treatment,** (  ) **court appearances,** (  ) **attorney visits or court ordered obligations, and** (  ) **other** _____.

____o. **HALFWAY HOUSE PLACEMENT**   The defendant shall reside at a  halfway house or community corrections center and abide by all the rules and regulations of the program.
You are restricted to the halfway house at all times except for: (  ) **employment;** (  ) **education;** (  ) **religious services;** (  ) **medical, substance abuse, or mental health treatment;** (  ) **attorney visits;** (  ) **court appearances;** (  ) **court ordered obligations;** (  ) **reporting to Pretrial Services; and** (  ) **other** _____.

__✓__p. May travel to and from: __SD/FL, SDNY + DDC__, and must notify Pretrial Services of travel plans before leaving and upon return. __EDNY + EDVIRGINIA__

__✓__q. Comply with the following additional conditions of bond:
__Appear in Court as directed, do not Change address w/o permission, do not commit further state or federal crimes, see doctors as per PTS report.__

33

DEFENDANT:___STONE_____
CASE NUMBER:___19-6039-SNOW_____
PAGE THREE

## PENALTIES AND SANCTIONS APPLICABLE TO DEFENDANT

Violation of any of the foregoing conditions of release may result in the immediate issuance of a warrant for the defendant's arrest, a revocation of release, an order of detention, as provided in 18 U.S.C. § 3148, forfeiture of any bail posted, and a prosecution for contempt as provided in 18 U.S.C. § 401, which could result in a possible term of imprisonment or a fine.

The commission of any offense while on pretrial release may result in an additional sentence upon conviction for such offense to a term of imprisonment of not more than ten years, if the offense is a felony; or a term of imprisonment of not more than one year, if the offense is a misdemeanor. This sentence shall be consecutive to any other sentence and must be imposed in addition to the sentence received for the offense itself.

Title 18 U.S.C. § 1503 makes it a criminal offense punishable by up to five years of imprisonment and a $250,000 fine to intimidate or attempt to intimidate a witness, juror or officer of the court; 18 U.S.C. § 1510 makes it a criminal offense punishable by up to five years of imprisonment and a $250,000 fine to obstruct a criminal investigation; 18 U.S.C. § 1512 makes it a criminal offense punishable by up to ten years of imprisonment and a $250,000 fine to tamper with a witness, victim or informant; and 18 U.S.C. § 1513 makes it a criminal offense punishable by up to ten years of imprisonment and a $250,000 fine to retaliate against a witness, victim or informant, or threaten to do so.

It is a criminal offense under 18 U.S.C. § 3146, if after having been released, the defendant knowingly fails to appear as required by the conditions of release, or to surrender for the service of sentence pursuant to a court order. If the defendant was released in connection with a charge of, or while awaiting sentence, surrender for the service of a sentence, or appeal or certiorari after conviction for:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more the defendant shall be fined not more than $250,000 or imprisoned for not more than ten years, or both;

(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years, the defendant shall be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3) any other felony, the defendant shall be fined not more than $250,000 or imprisoned not more than two years, or both;

(4) a misdemeanor, the defendant shall be fined not more that $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender shall be consecutive to the sentence of imprisonment for any other offense. In addition, a failure to appear may result in the forfeiture of any bail posted, which means that the defendant will be obligated to pay the full amount of the bond, which may be enforced by all applicable laws of the United States.

34

DEFENDANT:___STONE_____
CASE NUMBER:__19-6039-SNOW_____
PAGE FOUR

## PENALTIES AND SANCTIONS APPLICABLE TO SURETIES

Violation by the defendant of any of the foregoing conditions of release will result in an immediate obligation by the surety or sureties to pay the full amount of the bond. Forfeiture of the bond for any breach of one or more conditions may be declared by a judicial officer of any United States District Court having cognizance of the above entitled matter at the time of such breach, and if the bond is forfeited and the forfeiture is not set aside or remitted, judgment may be entered upon motion in such United States District Court against each surety jointly and severally for the amount of the bond, together with interest and costs, and execution may be issued and payment secured as provided by the Federal Rules of Criminal Procedure and other laws of the United States.

## SIGNATURES

I have carefully read and I understand this entire appearance bond consisting of four pages, or it as been read to me, and, if necessary, translated into my native language, and I know that I am obligated by law to comply with all of the terms of this bond. I promise to obey all conditions of this bond, to appear in court as required, and to surrender for service of any sentence imposed. I am aware of the penalties and sanctions outlined in this bond for violations of the terms of the bond.

If I am an agent acting for or on behalf of a corporate surety, I further represent that I am a duly authorized agent for the corporate surety and have full power to execute this bond in the amount stated.

**(NOTE: Page 5 of this form MUST be completed before the bond will be accepted for filing.)**

### DEFENDANT

Signed this __25__ day of __January_____, 2019  at Ft. Lauderdale, Florida.
Signed and acknowledged before me:             DEFENDANT:(Signature)X_____
WITNESS:_____             _____FT Lwde Ale_____FLA_____
                                            city                    state

### CORPORATE SURETY

Signed this _____ day of _____, 2019, at _____, Florida.
SURETY:_____             AGENT:(Signature)_____
_____    _____             PRINT NAME:_____
      city                state

### INDIVIDUAL SURETIES

Signed this__day of _____, 2019 , at _FTL___, Florida.     Signed this__day of _____, 2019 at _FTL__, Florida.
SURETY:(Signature)_____             SURETY:(Signature)_____
PRINT NAME:_____             PRINT NAME:_____
RELATIONSHIP TO                                RELATIONSHIP TO
DEFENDANT:_____             DEFENDANT:_____
_____    _____             _____    _____
      city                state                      city                state

   SURETY (Signature)_____             SURETY (Signature)_____
PRINT NAME:_____             PRINT NAME:_____
RELATIONSHIP:_____             RELATIONSHIP _____
      City/STATE_____             City/STATE_____

## APPROVAL BY COURT

Date:___1-25-19_____

_Lurana S. Snow_

**UNITED STATES MAGISTRATE JUDGE**  35

## (CM/ECF RESTRICTED)

DEFENDANT: STONE
CASE NUMBER: 13-6039-SNOW
PAGE FIVE:

## ADDRESS AND CONTACT INFORMATION
## FOR DEFENDANT AND SURETIES

As indicated in condition 3 of this bond, the defendant "May not change his or her present address as recorded on this bond without prior permission in writing from the court". The current addresses of the defendant and sureties are as indicated below:

DEFENDANT

**CORPORATE SURETY**

SURETY: _____

AGENT: _____

STREET ADDRESS _____

CITY: _____ STATE _____ ZIP _____

TELEPHONE: _____

**INDIVIDUAL SURETIES**

PRINT NAME: _____      PRINT NAME: _____

RELATIONSHIP _____      RELATIONSHIP _____

STREET ADDRESS _____      STREET ADDRESS _____

CITY: _____ STATE ____ ZIP ____      CITY: _____ STATE ____ ZIP ____


PRINT NAME: _____      PRINT NAME: _____

RELATIONSHIP: _____      RELATIONSHIP: _____

STREET ADDRESS: _____      STREET ADDRESS: _____

CITY: _____ STATE ____ ZIP ____      CITY: _____ STATE: ____ ZIP ____

TELEPHONE: _____      TELEPHONE: _____

# UNITED STATES DISTRICT COURT

## FOR THE

### SOUTHERN DISTRICT OF FLORIDA

Case No: 19-6039-SNOW
19-CR-0018

UNITED STATES OF AMERICA,
    Plaintiff,

v

**WAIVER OF REMOVAL HEARING**

**ROGER STONE, JR,**
**Defendant.**

I , Roger Stone , charged in a proceeding pending in the  District of  Columbia, with violation of 18:1001, 1505, 1512,2 and having been arrested in the Southern District of Florida and taken before a United States Magistrate Judge for that district, who informed me of the charge and of my right to retain counsel or request the assignment of counsel if I am unable to retain counsel, and to have a hearing or execute a waiver thereof, do hereby waive a hearing before the aforementioned magistrate judge and consent to the issuance of a warrant/ order  for my removal to the  District of  Columbia  where the aforesaid charge is pending against me.

January 25, 2019

X ...............................................................
                            Signature of defendant

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

37

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-6039-SNOW

UNITED STATES OF AMERICA

vs                    ORDER OF REMOVAL

ROGER JASON STONE, JR.                    /

It appearing that in the District of Columbia an indictment was returned against the above-named defendant on a charge of 18:1001, 1505, 1512, 2 that the defendant was arrested in the Southern District of Florida and was given a hearing before a United States Magistrate Judge at Fort Lauderdale, Florida, which official committed the defendant for removal to the District of Columbia, it is

ORDERED AND ADJUDGED that the defendant be removed to the above-named district for trial on said charge.

And it further appearing that the defendant waived further hearing in the said removal proceedings and was held by the Magistrate Judge for removal and posted bail in the amount of $250,000PSB which was approved by the United States Magistrate Judge, and it is further

ORDERED that the defendant shall appear in the aforesaid district at such times and places as may be ordered by that District Court, in accordance with the terms and conditions of aforesaid bail bond furnished by the defendant, and it is further

ORDERED that the funds, plus interest, which may have been deposited on behalf of this defendant with the Clerk of the Court under Bail Reform Act be transferred to the district where removed.

DONE AND ORDERED at Fort Lauderdale, Florida this 25th day of January,2019.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

cc: Miami, Financial